## John R. DEGLER *v.* STATE of Arkansas

CR 74-109                                    517 S.W. 2d 515

Opinion delivered December 16, 1974
[As modified January 27, 1975.]

*Gene Worsham,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *O. H. Hargraves,* Deputy, for appellee.

GEORGE ROSE SMITH, Justice. The appellant was charged with felony murder, in that he killed Curtis Turner during the perpetration of larceny. The jury returned a verdict of guilty and imposed a life sentence. Four points for reversal are argued.

First, it is contended that when this case was tried in the court below, a homicide committed in the perpetration of larceny no longer constituted a felony murder. Upon that premise it is arged that Degler could not lawfully be convicted of any offense greater than second-degree murder.

We cannot sustain that contention. This homicide occurred on June 12, 1973. Larceny was then included in the definition of felony murder. Ark. Stat. Ann. § 41-2205 (Repl. 1964). But larceny was not included in a similar definition contained in Act 438 of 1973. Ark. Stat. Ann. § 41-4702 (A) (Supp. 1973). Even though Act 438, absent an emergency clause, did not take effect until more than a month after the homicide now in question, the appellant insists that Act 438 was merely procedural and thus inapplicable to cases tried

after its effective date.

There are two answers to the appellant's argument. First, the purpose of Act 438 was to reinstate capital punishment for certain crimes only. Although the Act dropped larceny from the definition of *capital* offenses, the older definition appears to have been retained as a "life felony" by § 4 of Act 438. § 41-4704. Secondly, a change in the definition of murder is substantive rather than procedural. In fact, we can think of no provision in the criminal law that is more plainly substantive than the definition of the crime. Hence the older definition would be controlling in the trial of the case even if it had been repealed after the commission of the homicide. Ark. Stat. Ann. § 1-103 (Repl. 1956); *Clark* v. *State*, 246 Ark. 876, 440 S.W. 2d 205 (1969).

Secondly, it is contended that the trial court should have excluded Degler's confession and the State's allied proof that Degler later showed the officers where he had thrown the murder weapon and the stolen property. It is argued that the officers arrested Degler without probable cause and that therefore the confession and accompanying proof were inadmissible. *Davis* v. *Mississippi*, 394 U.S. 721 (1969); *Beck* v. *Ohio*, 379 U.S. 89 (1964). In the *Beck* case the court said that the validity of an arrest without a warrant, as here, depends upon whether the officers had probable cause to make it — "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."

Upon this point for reversal the appellant's recitation of the pertinent facts is so greatly abbreviated that we must discuss the proof in some detail. The homicide took place at what is referred to as the old State Dairy Farm house, in a rural part of Pulaski county. The house was casually frequented by a number of young people; "all the kids" that wanted to come there were welcome. (Degler was 22 at the time of the crime.) Two of the group had rented the house, but they were staying in Little Rock at the particular time in question.

On June 11, 1973, five young persons were at the house during the day. Charles Martin and Shirley Mooser were living there and had a key to the house. Degler, David Williamson, and Curtis Vanderpool were there during a substantial part of the day. Vanderpool left before the others did. Degler and Williamson, who had been drinking beer together for several hours, left at about 8:30 p.m., leaving Degler's distinctive yellow car still at the house. When Martin and Shirley also departed at about 9:00 p.m., they left the house unoccupied and locked. The decedent, Curtis Turner, had been at the house for about an hour on the preceding day, but he does not appear to have been there on the day in question.

Martin and Shirley returned at about 30 minutes after midnight. Curtis Turner's car was there, but Degler's yellow car was gone. Turner's dead body was lying on the front porch. Martin found that "a lot of stereo equipment and television and stuff" that had been there earlier was missing. Martin telephoned the sheriff's office to report the homicide. Two deputies — Harold Munn and another — came out to investigate. Munn also questioned several young people at the sheriff's office at three or four o'clock in the morning.

At about 9:30 that morning Officer Munn arrested Degler at his trailer home in North Little Rock. Munn, of course, had learned details of the homicide at the scene. He knew that Degler and Williamson were very good friends and traveled in each other's company. He had learned that one of them had a .22-caliber pistol. The police department had determined that a small-caliber weapon had been used in the killing. Munn knew that Degler's yellow car had been left on the premises before the homicide, and since the officer participated in the investigation at the house, it is reasonable to infer that he knew that the car was not there later on.

We are of the opinion that the trial court, drawing reasonable inferences from the testimony as a whole, was justified in finding that there was probable cause for the arrest. This case is quite unlike *Davis* v. *Mississippi, supra,* cited by the appellant. In *Davis* the police, acting upon information that a rape had been committed by a Negro youth, picked up from 40 to 50 such youths for questioning. In the

case at bar the information obtained by the officers implicated only Degler and Williamson. Those two young men had been at the Dairy Farm house during much of the day, had apparently been armed with a .22 pistol, had left Degler's car at the house when they departed together at about 8:30 p.m., and had evidently returned for it at some time before the homicide was discovered at 12:30 a.m. There is no indication in the record that the officers' investigation turned up facts tending to incriminate anyone other than Degler and Williamson. Moreover, this was not a case in which the officers could gather more data by obtaining a search warrant for the suspects' .22-caliber pistol, so that its test-fired bullets could be compared ballistically with those found in the victim's body. That procedure would not have been superior to an arrest in the officers' search for the truth, because the requirement of probable cause applies to an application for a search warrant as well as to an arrest. The officers acted reasonably upon the available facts; we are unwilling to say that the trial court was wrong in its conclusion that probable cause for the arrest existed.

Thirdly, the appellant contends that his confession should have been excluded as having been involuntarily made. In passing upon this contention we are required to review the evidence and make an independent determination of the ultimate issue of voluntariness. *Davis v. North Carolina,* 384 U.S. 737 (1966). We have recognized that duty ever since our decision in *Harris v. State,* 244 Ark. 314, 425 S.W. 2d 293 (1968), but we have not yet defined the standard to be followed in reaching our determination. See the concurring opinion in *Vault v. State,* 256 Ark. 343, 507 S.W. 2d 111 (1974). That omission necessarily makes it difficult for opposing counsel to argue the point on appeal. We now set the issue at rest by stating explicitly that in each case we will make an independent determination based upon the totality of the circumstances and that the trial judge's finding of voluntariness will not be set aside unless it is clearly against the preponderance of the evidence, which we take to be the same standard of review as the "clearly erroneous" rule followed by the federal courts. *United States v. U.S. Gypsum Co.,* 333 U.S. 364 (1948); *Maple Island Farm v. Bitterling,* 209 F. 2d 867 (8th Cir. 1954).

Degler was arrested at about 9:30 a.m., was warned of his rights, and signed a "waiver of rights", which recited the time as 9:40 a.m. At 10:10 Degler signed his first statement, in which he denied any part in the crime. It does not appear that his interrogation continued after his signing that statement.

The second suspect, Williamson, was arrested at about two o'clock. Williamson, after having been questioned, signed a statement (at a recited time of 2:10) in which he accused Degler of having fired the fatal shots. The officers then showed Williamson's statement to Degler, who read it and announced his desire to change his own statement. Degler then signed a statement (at a recited time of 3:35 p.m.) in which he said that he and Williamson had gone back to the house, had found nobody there, and had decided to take the stereo and t.v. set. Degler was carrying Williamson's gun. As Degler came out of the house "this man jumped up suddenly." Degler said that he was scared and fired three times. He then "took the player and t.v. to a spot along the road and ditched them." After signing the second statement Degler guided the officers to the place where the stolen property and murder weapon were recovered.

The record falls decidedly short of showing that the trial court's finding of voluntariness is clearly against the preponderance of the evidence. Although Degler was detained for some five and a half hours, he does not appear to have been subjected to interrogation during most of that time. Degler makes no assertion that he was mistreated. He does say, and the officers in effect admit, that he was told that he would feel better if he told the truth and got it off his chest. Degler stated, however, that the officers did not say how it would help him. Therre was certainly no offer of leniency. During the interrogation Degler was shown a Polaroid photograph of the victim's body, as it was found on the front porch, but there appears to be nothing particularly gruesome or inflammatory about the photograph (which is to be found in the record filed in Williamson's appeal from his conviction). It is also argued that the officers should not have shown Degler the statement that Williamson had made, but we do not see that Degler's constitutional rights were thereby

violated. In this connection the appellant cites *People* v. *Johnson,* 75 Cal. Rptr. 401, 450 P. 2d 865 (1969), but there the court found that the codefendant's statement had been unlawfully obtained, so that the fruit-of-the-poisonous-tree doctine was controlling. Here there is no similar proof that the codefendant's proof was unlawfully obtained. We find no error in the trial judge's admission of the confession into evidence.

Finally, the appellant, who had signed a confession on June 12, complains that the trial court refused to allow him to show by the testimony of cellmates in the Pulaski County jail that more than two months later Williamson, who was also in the jail cell, made threats against the appellant and his family in order to force the appellant to take the blame for the crime. We agree with the trial court's conclusion that threats made more than two months after the date of the confession had no bearing upon its voluntariness.

Affirmed.